**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**SHELTON LITTLEFIELD**                                                    **PLAINTIFF**

**v.**                              **Case No. 4:19-cv-00027-LPR**

**UNITED STATES OF AMERICA**                                        **DEFENDANT**

**MEMORANDUM OF DECISION**

On January 11, 2019, Plaintiff Shelton Littlefield filed a Complaint against the United States under the Federal Tort Claims Act ("FTCA"), alleging that he was injured in a fall due to the negligence of the nursing staff at a Veterans Affairs hospital.  On August 17, 2020, the Court held a bench trial.  The Parties submitted their proposed findings and conclusions of law to the Court by email on September 15, 2020.

In accordance with Federal Rule of Civil Procedure 52(a), and after reviewing the Parties' post-trial proposals as well as the entire record, the Court now makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. During the bench trial, seven witnesses provided testimony. Mr. Littlefield's witnesses were Sandra Littlefield,[1] Alan Littlefield,[2] Nurse Luanne Trahant,[3] Shelton Littlefield Jr.,[4]

---

[1] Sandra Littlefield is Mr. Littlefield's wife.  Tr. of Bench Trial (Doc. 30-1) at 3.

[2] Alan Littlefield is Mr. and Mrs. Littlefield's son.  *Id.* at 19, 27.

[3] Nurse Trahant testified as the Plaintiff's expert regarding the standard of care for nurses.  *Id.* at 41-42.  Nurse Trahant has practiced nursing, including rehabilitative nursing, in hospitals and nursing homes in central Louisiana.  *Id.* at 40. Nurse Trahant did not personally evaluate Mr. Littlefield or practice nursing at the facility where Mr. Littlefield was treated.

[4] Shelton Littlefield Jr. is Mr. and Mrs. Littlefield's son.  *Id.* at 19, 70-71.

and Nurse Cindy Carlat.[5]  The Government's witnesses were Dr. Larry Johnson[6] and Nurse

Holly Langster.[7]  The Court found all of the witnesses' testimonies to be credible.

2.  Mr. Littlefield is a 92-year-old man.[8]

3.  Mr. Littlefield is married to Sandra Littlefield.  They have been married 42 years.  Mrs.

Littlefield is 72 years of age.[9]

4.  Mr. Littlefield is a World War II-era veteran[10] who receives medical care through the

Veterans Affairs' (VA) healthcare system.[11]

5.  Prior to July 2009, Mr. and Mrs. Littlefield owned and operated a daycare center.  Mrs.

Littlefield supervised the children, while Mr. Littlefield's responsibilities included driving

a van to pick up the children at school, bookkeeping, and maintaining supplies like

groceries.[12]

6.  In 2009, Mr. Littlefield's health began to decline.  Mr. Littlefield visited doctors because

he was suffering from severe fatigue, but the doctors could not identify the cause.[13]

---

[5] Nurse Carlat testified as a fact witness regarding the circumstances surrounding Mr. Littlefield's fall and injury.  *Id.* at 81-82.

[6] Dr. Johnson was the medical director of the VA's Community Living Center at the time the injury occurred.  *Id.* at 111.  He is now a volunteer "Physician Ambassador" at the Center.  *Id.* at 109.  Dr. Johnson was not "identified as a nursing standard of care expert."  *Id.* at 126.  His testimony was "based on his perception of what he has seen in the unit."  *Id.*

[7] Nurse Langster testified as the Defendant's expert regarding the standard of care for nurses.  *Id.* at 161.  Nurse Langster has practiced nursing at hospitals in various locations in central Arkansas, including North Little Rock.  *Id.* at 155.  Nurse Langster has experience in treating "[f]rail patients and dementia patients," as she has "dealt with them as their bedside caregiver, and then as the overseer of the nurses."  *Id.* at 156.  Nurse Langster did not personally evaluate Mr. Littlefield or practice nursing at the facility where Mr. Littlefield was treated.

[8] *Id.* at 76.

[9] *Id.* at 4.

[10] *Id.* at 112.

[11] *Id.* at 5.

[12] *Id.* at 7.

[13] *Id.* at 8.

7. In July 2009, Mrs. Littlefield found Mr. Littlefield "sitting in the van with his heavy coat on and the heat running [because] he was so cold."  Mrs. Littlefield called their son, and they took Mr. Littlefield to a hospital emergency room.  At the hospital, Mr. Littlefield was diagnosed with lymphoma.[14]

8. Mr. Littlefield's health declined severely after his lymphoma diagnosis.  He was "in a coma on life support for a couple of months."  When he was finally released from the hospital and went back home in April 2010, he was bedridden.[15]

9. Between 2010 and 2015, Mr. Littlefield gradually recovered to the point that he could walk with a cane.  The Littlefield family was able to take Mr. Littlefield along when they went out to eat, to church, and to other events.[16]

10. Between 2010 and 2015, Mr. Littlefield would suffer urinary tract infections approximately "once every two or three months."[17]  When these infections occurred, "his mental status would decline.  He would start stumbling around.  He couldn't control how he walked."[18]  He would also get "agitated real easy."[19]  After Mr. Littlefield received antibiotic treatment for these infections, he would "go right back up . . . and everything would be okay."[20]

11. Mr. Littlefield "fell a couple of times" at home after his 2010 release from the hospital.[21]

---

[14] *Id.*

[15] *Id.* at 9.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at 10.

[20] *Id.* at 9-10.

[21] *Id.* at 10.

12. "One time he fell and hit his bed and cut his head" and "had to have staples."[22]  This injury appears to have occurred on July 11, 2015.[23]  It also appears that he was suffering from a urinary tract infection at this time.[24]  Mr. Littlefield was hospitalized.[25]

13. When Mr. Littlefield was hospitalized in July 2015, he was suffering from an "altered mental status."[26]  He was "quite ill with the delirium.  He had hallucinations.  He was very confused and the suspicion was he had another infection."[27]

14. When Mr. Littlefield "was in a strange place" like a hospital "at night when [Mrs. Littlefield] wasn't there, he would holler because he didn't know where he was at.  He was scared.  Usually if somebody could go in and talk with him, he would be okay."[28]

15. Mr. Littlefield's "mental status" eventually "improved, oriented to person and place."[29]  However, he would still become "easily agitated with staff during his hospitalization," and he needed "constant redirecting."[30]  There were concerns about whether he had recovered to the point where Mrs. Littlefield would be able to care for him at home.[31]

---

[22] *Id.*

[23] *Id.* at 117.

[24] *Id.* at 11.

[25] *Id.* at 11, 118.

[26] *Id.* at 118.

[27] *Id.*

[28] *Id.* at 11.

[29] *Id.* at 119.

[30] *Id.*

[31] *See id.* at 11-12 ("[T]he head of geriatrics . . . called [Mrs. Littlefield] in her office and she said [Mr. Littlefield] is wearing you out.  She said we're going to keep him downstairs at the Community Living Center and get him back on his feet, because like he had been in the hospital."), 120 ("The day before [Mr. Littlefield]  was admitted to the GEM, he came into the geriatric clinic, and the wife said she is overwhelmed and she can't care for him well at home at this very moment.  And so we offered—we, as the geriatricians and the service, said we can bring you into the GEM unit today and see what we can do to help you help your husband improve.").

16. In early August of 2015, Mr. Littlefield was admitted to the VA's Community Living Center for rehabilitation.[32]

17. It is useful to set out a general timeline of Mr. Littlefield's stay at the Community Living Center.  Upon admission, he was assigned to the geriatric evaluation and management unit (or "GEM unit").[33]  During his time in the GEM unit he was enrolled in physical therapy.[34]  Ultimately, the physical therapists said they could not make progress, so he was switched to a restorative care program, "which is a program that has nursing aides formally trained in aspects of therapy who know some of the safety aspects of therapy."[35]  The GEM unit is a short stay unit.[36]  So on August 21, 2015, he was admitted to the "one delta" (or "1-D") unit,[37] which, as discussed below, is basically a dementia unit.  When he came to the one delta unit, that unit once again enrolled him into the Community's physical therapy program.[38]  But, just like before, the physical therapists eventually said he still could not show enough progress.[39]  So he was dropped from the physical therapy program and put

---

[32] *Id.* at 112, 120-22.

[33] *Id.* at 114.

[34] *Id.* at 121.

[35] *Id.* at 121.  Regarding the difference between physical therapy and restorative care, Dr. Johnson explained that Mr. Littlefield "frequently would refuse, he frequently did not want to undergo therapy, it was too strenuous or too vigorous or too difficult. What these restorative therapists do is they are able to sit down with a patient and gain their trust and talk to them one-to-one. We have had patients who were immobile who therapy has said we cannot do anything with this person, he's too demented, he will not cooperate, and the restorative tech has gotten that patient to get up and walk. So they're like Lazarus, in that sense. They can communicate, they're very gentle, they cajole the patient. They reward them with little treats before and after, and patients get up and start walking to a much better extent than they did in formal therapy."  *Id.* at 123-24.

[36] *Id.* at 119.

[37] *Id.* at 47.

[38] *Id.* at 121.

[39] *Id.* at 122.

back into a restorative care program.[40]  He was still in the one-delta unit, which is where ultimately the fall in this case occurred.[41]

18. The head of geriatrics explained to Mrs. Littlefield that "when an old person is in the hospital, their muscles go real fast.  So they were going to take him and give him therapy, and they were going to put him in community living."[42]

19. Before Mr. Littlefield was hospitalized in July 2015, he used "his rolling walker at home."[43] Dr. Larry Johnson testified that "[t]he whole goal for [admitting Mr. Littlefield to the Community Living Center] was get him strong," to the point where he could walk "household distances."[44]  "The goal for him was to be able to be successful at home."[45]

20. As noted previously, Dr. Johnson was the medical director of the VA's Community Living Center at the time the injury occurred.[46]  He is now a volunteer "Physician Ambassador" at the Center.[47]  Dr. Johnson was not "identified as a nursing standard of care expert."[48] His testimony was "based on his perception of what he has seen in the unit."[49]

21. One of Mr. Littlefield's rehabilitation activities "was walking all the way down the hallway and back," with assistance from staff[50] and a rolling walker.[51]

---

[40] *Id.*

[41] *Id.* at 16.

[42] *Id.* at 11-12.

[43] *Id.* at 22.

[44] *Id.* at 120.

[45] *Id.* at 145-46.

[46] *Id.* at 109-11.

[47] *Id.* at 109.

[48] *Id.* at 126.

[49] *Id.*

[50] *Id.* at 13.

[51] *Id.* at 61.

22. Sometimes a physical therapist would help Mr. Littlefield walk, and sometimes a nurse would help him walk.[52]

23. A physical therapist would "have a predetermined goal."[53]  For example, "[a] therapist's goal may be today during this session we're going to ambulate 100 feet."[54]

24. A nurse, on the other hand, "may just get Mr. Littlefield up . . . and just walk him back however far they can and bring him back, just something to keep him going, keep him exercising, but not necessarily a predetermined time or predetermined schedule or plan."[55]

25. At the Community Living Center, it was "encouraged for nurses who are not technically restorative aides to also walk patients when the patient is willing to do so."[56]

26. Dr. Johnson explained that "[t]he challenge in a nursing home is that the nurses are so overwhelmed with work that it's hard for them to be encouraged to do other things, and those other things are very critical, which the main one is getting the patient up and walking if we possibly can.  So even when the restorative tech is not on the unit, the goal I have for my unit is please when you get a break, when you see a window of opportunity, can you get this patient up and walk them."[57]

27. Mrs. Littlefield testified that she had accompanied a physical therapist named Mike when he walked with Mr. Littlefield.[58]  When questioned if there were other staff members who

---

[52] *Id.* at 47-48.

[53] *Id.* at 48.

[54] *Id.* at 47-48.

[55] *Id.* at 48.

[56] *Id.* at 124.

[57] *Id.*

[58] *Id.* at 13.  The record indicates that "Mike" was Michael Collier.  *Id.* at 128.

provided assistance during these walks, Mrs. Littlefield answered that "[i]t was just Mike and I."[59]

28. There is also evidence that, on at least one occasion, Mr. Littlefield was accompanied by two staff members and Mrs. Littlefield when he walked.[60]  A nurse's note dated August 29, 2015 stated that "Mr. Littlefield ambulated with assist of two staff and his wife this afternoon.  One person was on each side and another staff member was pushing the wheelchair behind him in case he got [t]ired."[61]

29. Some notes are ambiguous as to how many staff members assisted Mr. Littlefield during the walks.  The Court finds that the notes mentioning "with staff" mean that there was at least one staff member assisting Mr. Littlefield.[62]  The Court also finds that Mr. Littlefield always walked with his rolling walker.

30. When asked what he had personally witnessed regarding the number of staff members who assisted patients with walking, Dr. Johnson stated:

> Virtually never, except in formal therapy in our formal therapy units, are we able to use two personnel with one patient.  So what is seen on my unit and in nursing homes that I've worked in are that you have one person assisting a patient who is walking.  So, no, you do not have two people, one pushing the wheelchair and one standby assisting the patient.  That is not what is done in the nursing homes that I have worked in.[63]

31. Mr. Littlefield made uneven progress in walking.  "There were records that demonstrated he could only walk 25 feet and then there were other records that would demonstrate that he could walk 200 feet."  The records also indicate that there were some days "where Mr.

---

[59] *Id.* at 13.

[60] *Id.* at 44.

[61] *Id.* at 149-50.

[62] *See, e.g., id.* at 160.

[63] *Id.* at 127.  As noted previously, Dr. Johnson testified as a fact witness, not as an expert.

Littlefield either could not or would not walk at all." The records show that he always needed at least some assistance when walking.[64]

32. The records indicate that Mr. Littlefield "would impulsively sit down" when walking with staff.[65]

33. After Mr. Littlefield began therapy at the Community Living Center, "it was very quickly recognized that he could not remember from day after day after day. Plus, there would be episodic refusals of care, which is common with demented patients. They don't want to exercise."[66]

34. "Ultimately," the physical therapists at the Community Living Center concluded that they were "not able to make any progress with Mr. Littlefield."[67] A note dated August 21, 2015 stated that "[p]atient's wife still states she wants to take the patient home if he has improvement of being able to transfer, but patient has reached maximum potential for kinesiotherapy due to refusal of therapy or inability to remember from day to day."[68]

35. On August 21, 2015, Mr. Littlefield was admitted to the one-delta (or 1-D) unit at the VA's Community Living Center.[69] The one-delta unit is for frail dementia patients.[70]

36. A kinesiotherapy evaluation conducted on August 24, 2015 gave Mr. Littlefield a "functional independent mobility" score of three, meaning that he needed "moderate assistance" when ambulating. The evaluation report stated, in part, that he required

---

[64] *Id.* at 43.

[65] *Id.* at 44.

[66] *Id.* at 121.

[67] *Id.*

[68] *Id.* at 122

[69] *Id.* at 47, 131, 135.

[70] *Id.* at 111.

"[r]olling walker ambulation with wheelchair trail and . . . moderate aid for assist times 50 feet and 25 feet respectively . . . ."[71]

37. Dr. Johnson provided the following explanation about the meaning of a "wheelchair trail":

> A wheelchair trail means two things: I'm following the patient, encouraging them, keep going, keep going, and I'm pulling the wheelchair behind me. It's usually collapsed so you can pull it. The wheelchair is collapsed so you pull it, and you hope that you can get it opened up and behind the patient before they start to wobble and sit down unintentionally. But they don't prevent falls. It's trying to prevent an injury if you can anticipate a fall.[72]

38. A kinesiotherapy report dated August 26, 2015 stated that "[v]eteran presented with spouse but was confused even upon entering the clinic, trying to hold onto the door frame to prevent entry." Regarding treatment, it stated: "Rolling walker, ambulated 15 feet and 80 feet respectively, with moderate assistance and a very close wheelchair trail. Unsafe with gait today, even more so than in previous sessions."[73]

39. Mr. Littlefield was "discharged from kinesiotherapy on August 27, 2015"[74] after formal therapy efforts failed.[75]

40. On September 2, 2015, Mr. Littlefield was accepted into the restorative nursing program in the one-delta unit.[76] This "meant the nurses were going to be the ones helping him to transfer in and out of the wheelchair and ambulate when he could" because "[h]e wasn't able to follow instructions and actually participate in a formal physical therapy or kinesiology-type program."[77]

---

[71] *Id.* at 48-50.

[72] *Id.* at 125-26. As noted previously, Dr. Johnson testified as a fact witness, not as an expert.

[73] *Id.* at 52.

[74] *Id.* at 61.

[75] *Id.* at 151.

[76] *Id.* at 61.

[77] *Id.* at 46.

41. A medical note dated September 2, 2015 at 10pm stated that Mr. Littlefield "refused to ambulate for this writer."[78]  The time entered on ambulation notes does not reflect the actual time when hospital staff walked or attempted to walk with Mr. Littlefield.  The notes were made by staff "at the end of the day when they get a chance to write them [and] document what they have done throughout the day."[79]  The Court finds this to be generally true for all ambulation notes in this case.

42. A note taken on September 3, 2015 at 11:08pm stated that "[t]his patient [Mr. Littlefield] does not ambulate."  An addendum to that note stated that Mr. Littlefield "[w]alked about 165 feet with staff."[80]  The Court understands from this that at one point on September 3, 2015, Mr. Littlefield refused to or could not walk.  Then, later that day, he walked with staff assistance.

43. A note from September 4, 2015 at 2:32pm stated that Mr. Littlefield "ambulated with staff 200 feet."[81]

44. A note made at 3:19pm on September 5, 2015 stated that Mr. Littlefield walked 50 feet with staff present three times, and a note made that evening at 8pm stated that Mr. Littlefield walked 100 feet with staff present.[82]

45. A note made at 2:20pm on September 6, 2015 stated that Mr. Littlefield walked 200 feet with staff present.[83]  The Court finds this to mean that sometime on September 6, 2015,

---

[78] *Id.* at 159.

[79] *Id.* at 89.

[80] *Id.* at 159-60.

[81] *Id.* at 160.

[82] *Id.*

[83] *Id.* at 62, 160.

prior to 2:20pm, this walk occurred.  It is unclear exactly how long before 2:20pm the walk occurred.

46. Nurse Trahant testified that these notes indicated that Mr. Littlefield was "making progress" in his rehabilitation, though not "consistent progress."[84]  The Court agrees and finds this as a matter of fact.

47. Shortly before 3:30pm on September 6, 2015, a nurse named David Merkel assisted Mr. Littlefield in a second walking session.[85]

48. Only Nurse Merkel assisted Mr. Littlefield during that walk.  Nurse Carlat testified that there was not "anyone else assisting David at that time."[86]

49. When Nurse Merkel took Mr. Littlefield for the walk on September 6, 2015, Nurse Carlat was sitting at a desk.  Nurse Carlat said that, at the time of the walk, "I was sitting at the desk and behind me kind of catty-corner was Mr. Littlefield's room and a big hallway . . . ."[87]  Nurse Carlat could not see Mr. Littlefield and Nurse Merkel from the desk.[88]

50. Nurse Carlat explained that the hallway wall "had a bar on it, a grab bar" that patients walked with.[89]

51. Nurse Carlat "heard David holler, 'I need some help down here.'  So [Nurse Carlat] immediately went down and [Mr. Littlefield] was on the floor."[90]  Nurse Carlat said that

---

[84] *Id.* at 62.

[85] *Id.* at 82-85.

[86] *Id.* at 85.

[87] *Id.* at 82.

[88] *Id.* at 55.

[89] *Id.* at 84.

[90] *Id.* at 83.

she was "not far" from Nurse Merkel and Mr. Littlefield when Nurse Merkel shouted for help.[91]

52. Nurse Carlat recalled that she "said 'David, did he fall?' And he said, 'I tried to assist him to the floor.'" Nurse Carlat asked Nurse Merkel, "[d]id you assist him to the floor?" and Nurse Merkel replied, "I tried to but I couldn't, you know, I couldn't keep him from falling."[92]

53. When Nurse Carlat came to help after Mr. Littlefield fell, a "wheelchair was there and it was approximately the length of a table away,"[93] and Mr. Littlefield's "walker was right in front of him."[94]

54. Nurse Carlat said that Nurse Merkel did not give any indication that Mr. Littlefield "lost his balance" due to a "trip, slip, dizziness, [or] anything like that." She said "it was so clear how he was sitting.  Mr. Littlefield was even saying I just couldn't—I had to sit down and, you know, I was unable to stay standing."[95]

55. At the time Mr. Littlefield fell on September 6, 2015, Mrs. Littlefield was at Kroger purchasing Gatorade for Mr. Littlefield.  She received a phone call when she was driving back to the hospital, but she did not answer because she was driving.[96]

---

[91] *Id.*

[92] *Id.* at 83-84.

[93] *Id.* at 57.

[94] *Id.* at 84.

[95] *Id.* at 86.

[96] *Id.* at 14

56. When Mrs. Littlefield got back to the hospital, Mr. Littlefield "was in a wheelchair and David was sitting in a chair next to him."[97]  One of the nurses "told [her that Mr. Littlefield] had fallen and they thought he had broken his hip."[98]

57. Nurse Merkel told Mrs. Littlefield that "he was real, real sorry and kept telling [her] how sorry he was, that he was walking Shelton and that he got distracted with another patient and turned around and in the corner of his eyes he saw Shelton fell and he ran and grabbed Shelton and went down to the floor with him."[99]

58. Mrs. Littlefield stated that "David was upset," repeatedly apologized, and was "visibly disturbed."[100]  The Court finds this to be true.

59. Mrs. Littlefield told Nurse Merkel, "David, you did everything you could, we do not blame you."  She offered this reassurance because Nurse Merkel "was so distraught" about the fall.[101]

60. When asked to describe her relationship with Nurse Merkel, Mrs. Littlefield stated that "[h]e was very nice, very accommodating.  We would stand and talk, you know.  So we had a good relationship."[102]

61. Alan Littlefield stated that Mr. Littlefield "liked [Nurse Merkel].  That's who he always wanted to take care of him.  He would always say, 'Have you seen David?'  And I was like, 'No, he's not here.'  So he didn't have any problems with him."[103]

---

[97] *Id.* at 15.

[98] *Id.* at 14.

[99] *Id.* at 15.

[100] *Id.* at 15-16.

[101] *Id.* at 22.

[102] *Id.* at 13-14.

[103] *Id.* at 30.

62. A fall report was authored by Nurse Carlat, even though she "did not witness the fall." Nurse Carlat used "the information [that] was given to her by David Merkel and then she entered it into the record."[104]

63. Nurse Merkel is now deceased, and "his formal version of events was never provided by any written electronic documentation."[105]

64. Nurse Carlat testified that she did not "ask Mr. Merkel if he had become distracted by anything while walking," and that Nurse Merkel did not "offer whether he did."[106]

65. Nurse Carlat's fall report stated as follows: "Description of how the fall occurred: Mr. Littlefield was walking with walker and standby assist from LPN. . . . He lost his balance and LPN assisted him to the floor but was unable to keep him from bumping his head on the door."[107]

66. On behalf of Plaintiff, Nurse Trahant testified as to the standard of care for nurses when assisting a patient like Mr. Littlefield in walking.[108]  Nurse Trahant "did [a] nurse practitioner residency, primarily in assisted living and nursing home fields."[109] She has practiced nursing, including rehabilitative nursing, in hospitals and nursing homes in central Louisiana.[110]

67. The Court finds that Nurse Trahant was familiar with the standard of practice in a locality similar to the one where Mr. Littlefield was treated.[111]

---

[104] *Id.* at 55.

[105] *Id.* at 177.

[106] *Id.* at 85.

[107] *Id.* at 85-86.

[108] *Id.* at 41-42.

[109] *Id.* at 40.

[110] *Id.*

[111] Arkansas Code § 16–114–206 mandates that the standard of care, failure to act in accordance with the standard,

68. In Nurse Trahant's opinion, the standard of care required someone to be "close enough to [Mr. Littlefield] to actually touch him" when Mr. Littlefield was walking.[112]

69. Nurse Trahant was also of the opinion "that the standard of care would have required at least two people to walk with [Mr. Littlefield]."[113]

70. Nurse Trahant believed that

> Mr. Littlefield should have had someone walking behind him with a wheelchair while he ambulated, but also someone that was at standby assist who could have provided him with tactile stimulation, or physical touch. In the event he couldn't follow instructions or in the event that he lost his balance or fell, they would go and provide him with assistance.[114]

71. Nurse Trahant further elaborated that

> [t]hey documented that [Mr. Littlefield] was impulsive. Impulsivity was important because the previous therapist had documented that he would impulsively sit down. So while they were trying to ambulate him, there were occurrences where he would become impulsive and just suddenly, abruptly sit down. That was very critical to my opinion and the reasoning behind having two people, other than the fact that it was also documented on at least one occasion that two people were required to walk with him.[115]

72. Nurse Trahant stated that she believed the standard of care required "one [staff member] with the wheelchair and one beside him" because,

> if I've got a wheelchair right behind him and I'm trying to push the wheelchair and provide standby assist, in the event he becomes dizzy or weak or just impulsively sits down, it's going to be more difficult for me to manage a wheelchair, Mr. Littlefield, he had a Foley catheter, a tubing, at

---

and proximate cause must be established by means of expert testimony "provided only by a medical care provider of the same specialty as the defendant . . . ." However, the Arkansas Supreme Court struck down the "same specialty" requirement as a violation of separation of powers. *Broussard v. St. Edward Mercy Health Sys., Inc.*, 2012 Ark. 14, at 7, 386 S.W.3d 385, 390. Though a court is not required to make a "same specialty" finding under *Broussard*, the Court does find that both Nurse Trahant and Nurse Langster were of the same specialty as Nurse Merkel.

[112] Tr. of Bench Trial (Doc. 30-1) at 42; *see also id.* at 62-63.

[113] *Id.* at 44.

[114] *Id.* at 42.

[115] *Id.* at 44.

> least a bag most likely hanging on his walker and then also a walker.  That's
> a lot to be able to manage.[116]

73. On behalf of Defendant, Nurse Langster testified as to the standard of care for nurses when

assisting a patient like Mr. Littlefield in walking.  Nurse Langster has practiced nursing at

hospitals in various locations in central Arkansas, including North Little Rock.[117]  Nurse

Langster has experience in treating "[f]rail patients and dementia patients," as she "dealt

with them as their bedside caregiver, and then as the overseer of the nurses."[118]

74. The Court finds that Nurse Langster was familiar with the standard of practice in a locality

similar to the one where Mr. Littlefield was treated.

75. When asked "if Mr. Littlefield was walking when Mr. Merkel was with him and Mr. Merkel

became distracted by something else and let his attention divert from Mr. Littlefield, you

would agree that that is a breach of the standard of care?" Nurse Langster answered, "[i]f

he left him, I would agree that was a breach of the standard of care."[119]  She added that if

Nurse Merkel

> answered someone else's question but was still present for standby assist, I
> do not believe that to be a breach of the standard of care.  If he heard a
> thump and looked to see what it was but did not leave him as a standby
> assist, I do not see that as a breach of the standard of care.[120]

76. Also regarding the standard of care, Nurse Langster's opinion was that, for a patient like

Mr. Littlefield, having a nurse "walking this patient with a rolling walker with a wheelchair

available while standing by to assist was within the standard of care."[121]

---

[116] *Id.*

[117] *Id.* at 155.

[118] *Id.* at 156.

[119] *Id.* at 171.

[120] *Id.* at 171-72.

[121] *Id.* at 161.

77. Regarding the specific number of staff members who should assist during a walk, Nurse Langster opined that "ambulating with a walker and a person is reasonable" and that she did "not believe that two people were required" to assist with walking.[122]

78. When asked whether she thought "that one assist and one operating the trailing wheelchair would be safer," Nurse Langster explained:

> I don't think so because most patients who fall, a fall is very different than I need to sit down where you can use the wheelchair and have them sit down. Most people don't fall backwards. They're not going to fall into a wheelchair that's behind them. So I don't find that to be more safe.[123]

79. With regard to Mr. Littlefield specifically, Nurse Langster stated:

> I don't think having a separate person with the wheelchair adds any additional safety to an ambulatory patient who has proven—particularly in this case, he has proven his ability to strengthen his walk. He's gone from 50 to 100 to 200 over just a few days. He has proven his strength and ability.[124]

80. Both experts' testimonies were based on their professional opinions. Neither expert (and neither party) provided documentary evidence of the standard of care.[125]

81. In the Court's opinion, the expert testimony regarding the number of hospital staff who should have walked with Mr. Littlefield is in equipoise. In light of the competing, equally-credible, and equally-persuasive expert testimonies, the Court finds that Mr. Littlefield has not carried his burden of proving that the standard of care required two or more staff members—one of whom trailed with a wheelchair—to walk with Mr. Littlefield on September 6, 2015.

---

[122] *Id.* at 169.

[123] *Id.* at 169-70.

[124] *Id.* at 170.

[125] *See* Tr. of Bench Trial (Rough Draft) at 212.

82. Both Nurse Trahant and Nurse Langster were in agreement that the standard of care required a staff member to stay close to Mr. Littlefield during the walking sessions.[126]  The Government's own expert, Nurse Langster, conceded that it would be a violation of the standard of care to leave Mr. Littlefield unattended.[127]

83. The Court finds that the United States breached the standard of care on September 6, 2015 when its agent, Nurse Merkel, "got distracted with another patient," turned away from Mr. Littlefield, and ventured far enough away that he had to "r[u]n" back to Mr. Littlefield when Mr. Littlefield fell during the walk.[128]

84. The Court finds that it is more likely than not that, if Nurse Merkel had not been distracted and moved away from Mr. Littlefield, he would have been able to prevent or control the fall and prevent injury.  The evidence indicates that the fall was not do to a "trip, slip, dizziness, [or] anything like that," but rather due to Mr. Littlefield becoming tired and attempting to sit down.[129]  Additionally, the fact that Nurse Merkel was able to "run" back to Mr. Littlefield and at least try to assist him to the ground dispels the notion that the fall was from some type of spontaneous or fast-occurring trip.

85. A doctor's note taken after Mr. Littlefield fell stated that "now he cannot extend his left leg without severe pain.  Will check with x-ray of the hip."[130]  A radiology report made for the x-ray of Mr. Littlefield's hip also noted that "[n]ow his left hip is painful with any movement of the left leg."[131]

---

[126] Tr. of Bench Trial (Doc. 30-1) at 42, 62-63, 171.

[127] *Id.* at 171.

[128] *Id.* at 15.

[129] *Id.* at 86.

[130] *Id.* at 164.

[131] *Id.* at 165.

86. The x-ray taken after Mr. Littlefield's fall on September 6, 2015 "show[ed] [a] left hip fracture."[132]

87. Mr. Littlefield was transported by ambulance after the fall.  The ambulance report stated that he experienced a "10 of 10" pain level "on movement."[133]

88. Mr. Littlefield had surgery to repair his broken hip.[134]

89. After the surgery, Mr. Littlefield returned to the one-delta unit.[135]

90. Alan Littlefield testified that, after the surgery, Mr. Littlefield was motivated to start rehabilitation activities, but "as time went on, I mean, it was evident that that wasn't going to—he wasn't going to be back to what he was."[136]

91. The medical records, however, indicate that Mr. Littlefield was "walking far in excess of what he was walking before his fracture" during his post-surgery rehabilitation exercises.[137]   The records show that he walked distances of 200-300 feet in February 2016.[138]  On March 29, 2016, "[r]ight before he was discharged," Mr. Littlefield walked a total of 454 feet with standby assistance from staff.[139]

92. In April 2016, Mr. Littlefield was "released from the VA unit" and returned home.[140]

---

[132] *Id.*

[133] *Id.*

[134] *Id.* at 16.

[135] *Id.*

[136] *Id.* at 32.

[137] *Id.* at 128.

[138] *Id.* at 128-29.

[139] *Id.* at 129.

[140] Id. at 74.

93. After being released from the hospital and returning home, Mr. Littlefield could only "walk a little ways."[141]  Mrs. Littlefield stated that Mr. Littlefield can only "walk the length of the living room," and even this he can do only with assistance.[142]  Mr. Littlefield has to be pushed in a wheelchair to the bathroom[143] or to the car.[144]  If Mr. Littlefield leaves the house, he has to be moved by wheelchair.[145]

94. Mr. Littlefield experiences pain in his left hip.  As an example, Mrs. Littlefield stated that "[t]he other night" Mr. Littlefield had trouble standing up after using the restroom.  "I have a bar right there, right in front of the bathroom that he grabs ahold of and stands up and he tried three or four times and said [his] left hip hurts so bad.  He named the hip."[146]

95. She also said "when we go riding, before he could ride all day. Now we could ride 10 or 15 minutes and his left hip is hurting."[147]

96. Mrs. Littlefield testified that

> his life is completely over you might say, along with mine.  I had to stay home with him all the time.  We can't go anywhere because it's got to the point where it hurts him to try to get up.  We try to ride in the car.  Ten minutes after we're in the car, he wants to go home because his hip hurts.[148]

97. Prior to 2015, Mr. Littlefield was generally "able to walk with a cane," and Mrs. Littlefield stated that "[w]e could go anywhere we wanted to."[149]  When asked to "[c]ompare his activity level and mobility level before the hip fracture with after," Mrs. Littlefield

---

[141] *Id.* at 18.

[142] *Id.*

[143] *Id.*

[144] *Id.* at 17.

[145] *Id.*

[146] *Id.* at 25.

[147] *Id.*

[148] *Id.* at 17.

[149] *Id.* at 9.

explained, "we went to church every Sunday. We went out to eat all the time. You know, we did things. We'd get in the car and take a ride to Greers Ferry or some place like that, you know. But not after that. It's been over with."[150]

98. When asked to give his "observation of [his] dad from April 2016 to the present," Shelton Littlefield Jr. stated that Mr. Littlefield is

> pretty much either bedridden or in his chair. He can't walk anymore without assistance. He tends to—I've had the chance to put him in the car and I have to literally lift him to put him in the car because he can't move his left hip. It's hard for him. His mobility is basically decreased 100 percent because he just doesn't get around anymore, he can't on his own.[151]

99. Shelton Littlefield Jr. stated that his father "complains constantly" of pain "[i]n his hip, in his back."[152]

100. When asked "about [his] dad's health and how he has done with his hip fracture and surgery," Alan Littlefield stated that

> he's at the point where his independence is completely gone, and he was a very independent person. He wanted to go—I mean, there would be weekends where we would all as a family just get in the car and just drive on Saturday or Sunday with no place specifically to head. Now, he is confined to the chair in the house, can't get him out any long period of time because he's uncomfortable. So it's a definite change I've seen in him, especially over the past probably two, three years now.[153]

101. When asked if he had "observe[d] whether [Mr. Littlefield is] in pain," Alan Littlefield answered "[y]eah, yeah, I would say so. The reason I say that is because he will shift in his chair and say his leg's hurting, so he'll have to lean this way in his chair to try to get pressure off of his hip."[154]

---

[150] *Id.* at 17-18.

[151] *Id.* at 75.

[152] *Id.*

[153] *Id.* at 30-31.

[154] *Id.* at 31.

102. Mr. Littlefield's wife and sons testified that Mr. Littlefield is demoralized by the deterioration in his condition.  Mrs. Littlefield said that "[h]e's always telling me he wished the Lord would just take him" because of his pain and loss of mobility.[155]  Alan Littlefield testified that "there have been times where [Mr. Littlefield is] just like I'm just done . . . ."[156]  Shelton Littlefield Jr. described his father as follows: "[b]efore all this happened, nothing bothered him.  I mean, I rarely heard him complain about anything.  After all this transpired, you could tell it had taken a toll on him and he'll let you know he's not comfortable."[157]

103. The Court finds that the September 6, 2015 fall, which occurred due to the United States' negligence, resulted in damages related to Mr. Littlefield's broken hip.

104. Regarding damages, the medical records show that Mr. Littlefield experienced significant pain after he fell and broke his hip.  The ambulance records show that Mr. Littlefield experienced a "10 of 10" pain level when he moved immediately after the injury, and that he was treated with fentanyl.[158]  Nurse Langster also testified in her capacity as an expert that the medical records show that, "both immediately following surgery and then continuing," Mr. Littlefield's pain "has been managed" with pain relievers.[159]

105. Mr. Littlefield's pain "has been managed with over-the-counter Tylenol" because "Mrs. Littlefield did not want her husband to have narcotic pain medication."[160]  Mrs. Littlefield testified that Mr. Littlefield takes "[o]nly Tylenol, by [her] choice" because narcotic pain

---

[155] *Id.* at 17.

[156] *Id.* at 30-31.

[157] *Id.* at 75-76.

[158] *Id.* at 165.

[159] *Id.* at 166.

[160] *Id.*

medication "just threw him for a loop. [She] couldn't see him that way."[161]   The Court understands Mrs. Littlefield's decision.   However, the Court finds from this and the testimony provided by the other family witnesses that Mr. Littlefield's pain is not overwhelming or excruciating.   The Court finds that Mr. Littlefield has pain often, but it is manageable.

106.   Though Mr. Littlefield's family offered testimony about pain and loss of mobility that they attributed to Mr. Littlefield's hip injury, neither expert offered a long-term prognosis regarding Mr. Littlefield's hip injury or future pain and suffering.

107.   The evidence shows that Mr. Littlefield was already suffering from a decline in mobility prior to his fall (in fact, his declining mobility was the very reason he was walking with Nurse Merkel at the time of his fall).

108.   The medical records stated that "left lower extremity knee pain" was a cause of Mr. Littlefield's difficulty with walking prior to his fall.[162]   In fact, an August 21, 2015 kinesiotherapy report stated that "knee pain [w]as the limiting factor for safety and distance."[163]   This indicates that Mr. Littlefield was already experiencing pain on his left side prior to the fall and broken hip.

109.   Mr. Littlefield proposes that "[a] fair and reasonable sum for the injuries suffered by Plaintiff is $400,000."[164]   In closing argument, Mr. Littlefield stated that the requested damages award was in recognition of "the pain and suffering and disability that Mr.

---

[161] *Id.* at 18.

[162] *Id.* at 51.

[163] *Id.* at 50.

[164] Pl.'s Proposed Findings of Fact and Conclusions of Law at 6.

Littlefield has suffered since" the fall.[165]   The United States proposes a finding of no negligence, and thus does not offer a proposed sum of damages.[166]

110.   The Court finds that Mr. Littlefield's past, current, and future pain and suffering attributable to the United States' negligence on September 6, 2015 is $72,000.  The Court's damages finding reflects the fact that Mr. Littlefield suffered severe pain immediately after the fall, had to undergo surgery to repair his hip, and has had to take over-the-counter painkillers to manage his pain "both immediately following surgery and then continuing."[167]   The Court's damages finding also reflects the small but serious change to Mr. Littlefield's lifestyle that is attributable to the fall.  Given Mr. Littlefield's past illnesses and his current age, it is admittedly difficult to determine what is attributable to the fall and would have been his lifestyle and pain without the fall.  Without being morbid, the Court notes that Mr. Littlefield has lived well beyond the life expectancy of a male born in the United States in the 1920s.  The Court will not speculate on how long Mr. Littlefield will last.  The Court finds that approximately $12,000 for each of the last five years is appropriate.  And the Court is adding one more year's worth of money to reflect the uncertainty of Mr. Littlefield's lifespan, as well as to compensate for the initial pain and trauma associated with the fall and surgery.

## II.  CONCLUSIONS OF LAW

"The FTCA gives district courts jurisdiction over claims against the United States for money damages 'for injury . . . caused by the negligent or wrongful act or omission of any

---

[165] Tr. of Bench Trial (Rough Draft) at 218.

[166] *See generally* Def.'s Proposed Findings of Fact and Conclusions of Law.

[167] Tr. of Bench Trial (Doc. 30-1) at 166.

employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'"[168]  Thus, "[t]o determine the extent of the government's liability under the FTCA," federal courts "look to state law."[169]  Damages are also "determined according to the relevant state law."[170]

"[I]n any action for medical injury" in Arkansas, "the plaintiff must prove the applicable standard of care; that the medical provider failed to act in accordance with that standard; and that such failure was a proximate cause of the alleged damages."[171]  A plaintiff in a medical malpractice case bears the burden of proving a medical provider's negligence by a preponderance of the evidence.[172]

> "[T]o sustain a claim for medical malpractice" under Arkansas law,
>
> a plaintiff must prove, among other elements, the applicable standard of care and the defendant's breach thereof.  The standard of care applicable to a case is defined by statute as "the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing . . . in the locality in which he practices or in a similar locality."[173]

It is well settled in Arkansas "that a plaintiff must present expert testimony when the asserted negligence does not lie within the [fact-finder's] comprehension as a matter of common knowledge."[174]  In other words, an expert is required "when the applicable standard of care is not

---

[168] *Lockhart v. United States*, 834 F.3d 952, 955 (8th Cir. 2016) (quoting *Sheridan v. United States*, 487 U.S. 392, 398 (1988)); 28 U.S.C. § 1346(b)(1).

[169] *White v. United States*, 959 F.3d 328, 332 (8th Cir. 2020) (citing *Molzof v. United States*, 502 U.S. 301, 305 (1992)).

[170] *Wilkinson v. United States*, 564 F.3d 927, 934 (8th Cir. 2009).

[171] *Fryar v. Touchstone Physical Therapy, Inc.*, 365 Ark. 295, 304, 229 S.W.3d 7, 14 (2006).

[172] *See, e.g., Webb v. Bouton*, 350 Ark. 254, 261-62, 85 S.W.3d 885, 889 (2002).

[173] *Skaggs v. Johnson*, 323 Ark. 320, 324, 915 S.W.2d 253, 255 (1996) (citations omitted).

[174] *Id.* at 325, 915 S.W.2d at 256 (citation omitted).

a matter of common knowledge, and when the [fact-finder] must have the assistance of experts to decide the issue of negligence."[175]

> Under the Arkansas locality rule,
>
> [a]n expert witness need not be one who has practiced in the particular locality, or one who is intimately familiar with the practice in it in order to be qualified as an expert in a medical malpractice action, "if an appropriate foundation is established to demonstrate that the witness is familiar with the standard of practice in a similar locality, either by his testimony or by other evidence showing the similarity of localities."[176]

Arkansas Code § 16–114–206 mandates that the standard of care, failure to act in accordance with the standard, and proximate cause must be established by means of expert testimony "provided only by a medical care provider of the same specialty as the defendant . . . ."  However, the Arkansas Supreme Court struck down the "same specialty" requirement as a violation of separation of powers.[177]

"Evidence of future pain and suffering and permanent disability must be established with reasonable certainty and must not be left up to speculation or conjecture on the part of the fact-finder."[178]  The Arkansas Supreme Court has "reversed and remanded for a damages hearing" when the "appellees' own self-serving testimony was the only proof of the nature, extent, and permanency of injury."[179]

As discussed in the Court's Findings of Fact, and incorporated into the Conclusions of Law, the applicable burden of care at issue in this case required at least one staff member to

---

[175] *Id.*

[176] *Brazeal v. Cooper*, 2016 Ark. App. 442, at 5, 503 S.W.3d 829, 833 (quoting *First Commercial Tr. Co. v. Rank*, 323 Ark. 390, 401, 915 S.W.2d 262, 267 (1996)).

[177] *Broussard*, 2012 Ark. at 7, 386 S.W.3d at 390.

[178] *MCSA, LLC v. Thurmon*, 2014 Ark. App. 540, at 7-8, 444 S.W.3d 428, 433.

[179] *Id.* at 8, 444 S.W.3d at 433.

accompany and assist Mr. Littlefield when he was walking with his walker.[180]  The two experts who testified to this at trial were familiar with the standard of care in the same or similar locality. The Government failed to act in accordance with that standard when its agent, Nurse Merkel, "got distracted with another patient and turned around," moving far enough away from Mr. Littlefield that he had to "r[u]n back" when Mr. Littlefield fell.[181]  Finally, Mr. Littlefield proved that this failure was a proximate cause of his hip injury and the resulting pain, surgery, impaired mobility, and small but serious loss of enjoyment of life.  The Court concludes that he is entitled to $72,000 as described in the Findings of Fact section and incorporated in this Conclusions of Law section.

## CONCLUSION

In accordance with the Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED that judgment shall be entered in FAVOR of Plaintiff Shelton Littlefield and AGAINST Defendant United States of America for damages in the amount of $72,000.  Judgment will be entered accordingly.

IT IS SO ORDERED this 6th day of November 2020.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[180] The Court also notes that Nurse Merkel had a wheelchair close by when he was walking with Mr. Littlefield.

[181] Tr. of Bench Trial (Doc. 30-1) at 15.  The Court notes, as discussed in the Findings of Fact and incorporated into the Conclusions of Law, that Mr. Littlefield did not prove that the standard of care required two or more hospital staff members—one of whom trailed with a wheelchair—to walk with Mr. Littlefield on September 6, 2015.